**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**STARRETT CITY ASSOCIATES, Starrett City, Inc., Delmar Management Company, Defendants–Appellants.**

Docket 87–6132.
No. 1483.

United States Court of Appeals,
Second Circuit.

Argued July 16, 1987.
Decided March 1, 1988.

tional donors, and not to the extent that it refers to a civil investigation of BYU."

William Bradford Reynolds, Asst. U.S. Atty. Gen., Washington, D.C. (David K. Flynn, William R. Yeomans, U.S. Dept. of Justice, Washington, D.C., Andrew J. Maloney, U.S. Atty. for the Eastern District of N.Y., Brooklyn, N.Y., of counsel), for plaintiff-appellee.

Morris B. Abram, New York City (Colleen McMahon, Michael G. Carey, Daniel L. Sosland, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendants-appellants.

Before NEWMAN, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

The United States Attorney General, on behalf of the United States ("the government"), commenced this action under Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act" or "the Act") against defendants-appellants Starrett City Associates, Starrett City, Inc. and Delmar Management Company (collectively, "Starrett") in the United States District Court for the Eastern District of New York (Neaher, J.). The government maintained that Starrett's practices of renting apartments in its Brooklyn housing complex solely on the basis of applicants' race or national origin, and of making apartments unavailable to black and hispanic applicants that are then made available to white applicants, violate section 804(a), (b), (c) and (d) of the Act, 42 U.S.C. § 3604(a)-(d) (1982).

The parties made cross-motions for summary judgment based on extensive documentary submissions. The district court granted summary judgment in favor of the government and permanently enjoined appellants from discriminating on the basis of race in the rental of apartments. Starrett appeals from this judgment.

## BACKGROUND

Appellants constructed, own and operate "Starrett City," the largest housing development in the nation, consisting of 46 high-rise buildings containing 5,881 apartments in Brooklyn, New York. The complex's rental office opened in December 1973. Starrett has made capital contributions of $19,091,000 to the project, the New York State Housing Finance Agency has made $362,720,000 in mortgage loans, and the U.S. Department of Housing and Urban Development subsidizes Starrett's monthly mortgage interest payments. The United Housing Foundation abandoned a project to build a development of cooperative apartments at the Starrett City site in 1971. Starrett proposed to construct rental units on the site on the condition that the New York City Board of Estimate approve a transfer to Starrett of the city real estate tax abatement granted to the original project. The transfer created "substantial community opposition" because "the neighborhood surrounding the project and past experience with subsidized housing" created fear that "the conversion to rental apartments would result in Starrett City's becoming an overwhelmingly minority development." *United States v. Starrett City Assocs.*, 660 F.Supp. 668, 670 (E.D.N.Y.1987). The transfer was approved, however, "upon the assurance of Starrett City's developer that it was intended to create a racially integrated community." *Id.*

Starrett has sought to maintain a racial distribution by apartment of 64% white, 22% black and 8% hispanic at Starrett City. *Id.* at 671. Starrett claims that these racial quotas are necessary to prevent the loss of white tenants, which would transform Starrett City into a predominantly minority complex. Starrett points to the difficulty it has had in attracting an integrated applicant pool from the time Starrett City opened, despite extensive advertising and promotional efforts. Because of these purported difficulties, Starrett adopted a tenanting procedure to promote and maintain the desired racial balance. This procedure has resulted in relatively stable percentages of whites and minorities living at Starrett City between 1975 and the present. *See id.* at 672.

The tenanting procedure requires completion of a preliminary information card stating, *inter alia,* the applicant's race or national origin, family composition, income and employment. The rental office at Starrett City receives and reviews these applications. Those that are found preliminarily eligible, based on family composition, income, employment and size of apartment sought, are placed in "the active file," in which separate records by race are maintained for apartment sizes and income levels. Applicants are told in an acknowledgement letter that no apartments are presently available, but that their applications have been placed in the active file and that they will be notified when a unit becomes available for them. When an apartment becomes available, applicants are selected from the active file for final processing, creating a processed applicant pool. As vacancies arise, applicants of a race or national origin similar to that of the departing tenants are selected from the pool and offered apartments.

In December 1979, a group of black applicants brought an action against Starrett in the United States District Court for the Eastern District of New York. The district court certified the plaintiff class in June 1983. *Arthur v. Starrett City Assocs.*, 98 F.R.D. 500 (E.D.N.Y.1983). Plaintiffs alleged that Starrett's tenanting procedures violated federal and state law by discriminating against them on the basis of race. The parties stipulated to a settlement in May 1984, and a consent decree was entered subsequently, *see Arthur v. Starrett City Assocs.*, No. 79–CV–3096, slip op. at 1 (E.D.N.Y. April 2, 1985). The decree provided that Starrett would, depending on apartment availability, make an additional 35 units available each year for a five-year period to black and minority applicants. *Id.* at 10.

The government commenced the present action against Starrett in June 1984, "to place before the [c]ourt the issue joined but left expressly unresolved" in the *Arthur*

consent decree: the "legality of defendants' policy and practice of limiting the number of apartments available to minorities in order to maintain a prescribed degree of racial balance." *United States v. Starrett City Assocs.*, 605 F.Supp. 262, 263 (E.D.N.Y.1985). The complaint alleged that Starrett, through its tenanting policies, discriminated in violation of the Fair Housing Act. Specifically, the government maintained that Starrett violated the Act by making apartments unavailable to blacks solely because of race, 42 U.S.C. § 3604(a); by forcing black applicants to wait significantly longer for apartments than whites solely because of race, *id.* § 3604(b); by enforcing a policy that prefers white applicants while limiting the numbers of minority applicants accepted, *id.* § 3604(c); and by representing in an acknowledgement letter that no apartments are available for rental when in fact units are available, *id.* § 3604(d). Because the government had refused to intervene in the *Arthur* suit, defendants moved to dismiss this suit as barred under the judicial estoppel doctrine. On April 2, 1985, that motion was denied. 605 F.Supp. at 265.

Following a period for taking discovery, the government moved for summary judgment on January 30, 1986. Defendants made a cross-motion for summary judgment on May 5, 1986. Extensive documentary submissions were made, and arguments on the motion were heard on August 26, 1986.

Starrett maintained that the tenanting procedures "were adopted at the behest of the [s]tate solely to achieve and maintain integration and were not motivated by racial animus." 660 F.Supp. at 673. To support their position, appellants submitted the written testimony of three housing experts. They described the "white flight" and "tipping" phenomena, in which white residents migrate out of a community as the community becomes poor and the minority population increases, resulting in the transition to a predominantly minority community. *See id.* at 674. Acknowledging that " 'the tipping point for a particular housing development, depending as it does on numerous factors and the uncertainties

of human behavior, is difficult to predict with precision,' " one expert stated that the point at which tipping occurs has been estimated at from 1% to 60% minority population, but that the consensus ranged between 10% and 20%. *Id.* Another expert, who had prepared a report in 1980 on integration at Starrett City for the New York State Division of Housing and Community Renewal, estimated the complex's tipping point at approximately 40% black on a population basis. *Id.* at 674–75. A third expert, who had been involved in integrated housing ventures since the 1950's, found that a 2:1 white-minori+ ratio produced successful integration. *See id.* at 676.

The court, however, accepted the government's contention that Starrett's practices of making apartments unavailable for blacks, while reserving them for whites, and conditioning rental to minorities based on a "tipping formula" derived only from race or national origin are clear violations of the Fair Housing Act. The district court found that apartment opportunities for blacks and hispanics were far fewer "than would be expected if race and national origin were not taken into account," while opportunities for whites were substantially greater than what their application rates projected. *Id.* at 672. Minority applicants waited up to ten times longer than the average white applicant before they were offered an apartment. *Id.* at 676. Starrett City's active file was 21.9% white in October 1985, but whites occupied 64.7% of the apartments in January 1984. Although the file was 53.7% black and 18% hispanic in October 1985, blacks and hispanics, respectively, occupied only 20.8% and 7.9% of the apartments as of January 1984. *Id.* at 672. Appellants did not dispute this. Further, the court found that appellants' tipping argument was undercut by the "wide elasticity of that standard" and the lack of difficulty they had in increasing their black quota from 21% to 35% "when it became necessary to avoid litigating the private *Arthur* lawsuit which threatened their unlawful rental practices." *Id.* at 678. The court also found that Starrett violated the Act by making untrue representations of

apartment unavailability to qualified minority applicants in order to reserve units for whites. *Id.* at 676. Finally, the court rejected Starrett's claim that the duty imposed upon government to achieve housing integration justified its actions, stating that "[d]efendants cannot arrogate to themselves the powers" of a public housing authority. *Id.* at 678.

The court concluded that Starrett's obligation was "simply and solely to comply with the Fair Housing Act" by treating "black and other minority applicants ... on the same basis as whites in seeking available housing at Starrett City." *Id.* The court noted that Starrett did not dispute any of the operative facts alleged to show violations of the Fair Housing Act. *Id.* at 672, 678-79. Accordingly, Judge Neaher granted summary judgment for the government, enjoining Starrett from discriminating against applicants on the basis of race and "[r]equiring [them] to adopt written, objective, uniform, nondiscriminatory tenant selection standards and procedures" subject to the court's approval. *Id.* at 679. The court retained jurisdiction over the parties for three years. *Id.*

On appeal, Starrett presses arguments similar to those it made before the district court. We affirm the district court's judgment.

## DISCUSSION

Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act" or "the Act"), 42 U.S. C. §§ 3601–3631 (1982), was enacted pursuant to Congress' thirteenth amendment powers, *see Williams v. Matthews Co.,* 499 F.2d 819, 825 (8th Cir.), *cert. denied,* 419 U.S. 1021 & 1027, 95 S.Ct. 495 & 507, 42 L.Ed.2d 294 & 302 (1974); *United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 120–21 (5th Cir.), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973); *United States v. Hunter,* 459 F.2d 205, 214 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Section 3604 of the statute prohibits discrimination be-

cause of race, color or national origin in the sale or rental of housing by, *inter alia:* (1) refusing to rent or make available any dwelling, *id.* § 3604(a); (2) offering discriminatory "terms, conditions or privileges" of rental, *id.* § 3604(b); (3) making, printing or publishing "any notice, statement, or advertisement ... that indicates any preference, limitation, or discrimination based on race, color ... or national origin," *id.* § 3604(c); and (4) representing to any person "that any dwelling is not available for ... rental when such dwelling is in fact so available," *id.* § 3604(d).

■ Housing practices unlawful under Title VIII include not only those motivated by a racially discriminatory purpose, but also those that disproportionately affect minorities. *See, e.g., Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036–37 (2d Cir.1979). Section 3604 "is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons." *See Southend Neighborhood Improv. Ass'n v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir.1984). Although "not every denial, especially a temporary denial, of low-income public housing has a discriminatory impact on racial minorities" in violation of Title VIII, *see Arthur v. City of Toledo,* 782 F.2d 565, 577 (6th Cir. 1986), an action leading to discriminatory effects on the availability of housing violates the Act, *see Southend Neighborhood Improv. Ass'n,* 743 F.2d at 1209–10.

Starrett's allocation of public housing facilities on the basis of racial quotas, by denying an applicant access to a unit otherwise available solely because of race, produces a "discriminatory effect ... [that] could hardly be clearer," *Burney v. Housing Auth.,* 551 F.Supp. 746, 770 (W.D.Pa. 1982). Appellants do not contend that the plain language of section 3604 does not proscribe their practices. Rather, they claim to be "clothed with governmental authority" and thus obligated, under *Otero v. New York City Housing Auth.,* 484 F.2d 1122 (2d Cir.1973), to effectuate the purpose of the Fair Housing Act by affirmatively promoting integration and preventing "the reghettoization of a model inte-

grated community." We need not decide whether Starrett is a state actor, however. Even if Starrett were a state actor with such a duty, the racial quotas and related practices employed at Starrett City to maintain integration violate the antidiscrimination provisions of the Act.

Both Starrett and the government cite to the legislative history of the Fair Housing Act in support of their positions. This history consists solely of statements from the floor of Congress. *See Hunter,* 459 F.2d at 210 n. 4. These statements reveal "that at the time that Title VIII was enacted, Congress believed that strict adherence to the anti-discrimination provisions of the [A]ct" would eliminate "racially discriminatory housing practices [and] ultimately would result in residential integration." *Burney,* 551 F.Supp. at 769; *see* Rubinowitz & Trosman, *Affirmative Action and the American Dream: Implementing Fair Housing Policies in Federal Home-ownership Programs,* 74 Nw.U.L.Rev. 491, 538 n. 178 (1979). Thus, Congress saw the antidiscrimination policy as the means to effect the antisegregation-integration policy. *See* 551 F.Supp. at 769. While quotas promote Title VIII's integration policy, they contravene its antidiscrimination policy, bringing the dual goals of the Act into conflict. The legislative history provides no further guidance for resolving this conflict.

█ We therefore look to analogous provisions of federal law enacted to prohibit segregation and discrimination as guides in determining to what extent racial criteria may be used to maintain integration. Both the thirteenth amendment, pursuant to which Title VIII was enacted, and the fourteenth amendment empower Congress to act in eradicating racial discrimination, *Constructors Ass'n of W. Pa. v. Kreps,* 573 F.2d 811, 816 n. 12 (3d Cir.1978), and both the fourteenth amendment and Title VIII are informed by the congressional goal of eradicating racial discrimination through the principle of antidiscrimination, *see Kennedy Park Homes Ass'n v. City of Lackawanna,* 318 F.Supp. 669, 694 (W.D. N.Y.), *aff'd,* 436 F.2d 108 (2d Cir.1970),

*cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (stating that each of these provisions "proscribes discriminatory conduct because of race or color"). Further, the parallel between the antidiscrimination objectives of Title VIII and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1982), has been recognized. *See, e.g., Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982). Thus, the Supreme Court's analysis of what constitutes permissible race-conscious affirmative action under provisions of federal law with goals similar to those of Title VIII provides a framework for examining the affirmative use of racial quotas under the Fair Housing Act.

Although any racial classification is presumptively discriminatory, *see Personnel Admin. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979), a race-conscious affirmative action plan does not necessarily violate federal constitutional or statutory provisions, *see, e.g., United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion) (fourteenth amendment); *United Steelworkers v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979) (Title VII). However, a race-conscious plan cannot be "ageless in [its] reach into the past, and timeless in [its] ability to affect the future." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion). A plan employing racial distinctions must be temporary in nature with a defined goal as its termination point. *See, e.g., Johnson v. Transportation Agency,* —— U.S. ——, 107 S.Ct. 1442, 1456, 94 L.Ed.2d 615 (1987); *Paradise,* 107 S.Ct. at 1070; *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 3053, 92 L.Ed.2d 344 (1986) (fifth amendment equal protection); *Fullilove v. Klutznick,* 448 U.S. 448, 489, 100 S.Ct. 2758, 2780, 65 L.Ed.2d 902 (1980); *Weber,* 443 U.S. at 208–09, 99 S.Ct. at 2729–30; *see also Jaimes v. Lucas Metropolitan Housing Auth.,* 833 F.2d 1203, 1208 (6th Cir. 1987) (stating that affirmative integration plan for public housing authority "should end upon the [district] court's finding that its goal has been accomplished"). More-

over, we observe that societal discrimination alone seems "insufficient and over expansive" as the basis for adopting so-called "benign" practices with discriminatory effects "that work against innocent people," *Wygant*, 106 S.Ct. at 1848, in the drastic and burdensome way that rigid racial quotas do. Furthermore, the use of quotas generally should be based on some history of racial discrimination, *see id.* at 1847, or imbalance, *see Johnson*, 107 S.Ct. at 1452–53, within the entity seeking to employ them. Finally, measures designed to increase or ensure minority participation, such as "access" quotas, *see Burney*, 551 F.Supp. at 763, have generally been upheld, *see, e.g., Johnson*, 107 S.Ct. at 1456–57; *Paradise*, 107 S.Ct. at 1070–71; *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729. However, programs designed to maintain integration by limiting minority participation, such as ceiling quotas, *see Burney*, 551 F.Supp. at 763, are of doubtful validity, *see Jaimes*, 833 F.2d at 1207 (invalidating public housing authority integration plan to the extent it acts as strict racial quota), because they " 'single[ ] out those least well represented in the political process to bear the brunt of a benign program,' " *Fullilove*, 448 U.S. at 519, 100 S.Ct. at 2796 (Marshall, J., concurring) (quoting *Regents v. Bakke*, 438 U.S. 265, 361, 98 S.Ct. 2733, 2784, 57 L.Ed.2d 750 (1978) (Brennan, J., concurring in part and dissenting in part)).

■■■ Starrett's use of ceiling quotas to maintain integration at Starrett City lacks each of these characteristics. First, Starrett City's practices have only the goal of integration maintenance. The quotas already have been in effect for ten years. Appellants predict that their race-conscious tenanting practices must continue for at least fifteen more years, but fail to explain adequately how that approximation was reached. In any event, these practices are far from temporary. Since the goal of integration maintenance is purportedly threatened by the potential for "white flight" on a continuing basis, no definite termination date for Starrett's quotas is perceivable. Second, appellants do not assert, and there is no evidence to show, the existence of prior racial discrimination or

discriminatory imbalance adversely affecting whites within Starrett City or appellants' other complexes. On the contrary, Starrett City was initiated as an integrated complex, and Starrett's avowed purpose for employing race-based tenanting practices is to maintain that initial integration. Finally, Starrett's quotas do not provide minorities with access to Starrett City, but rather act as a ceiling to their access. Thus, the impact of appellants' practices falls squarely on minorities, for whom Title VIII was intended to open up housing opportunities. Starrett claims that its use of quotas serves to keep the numbers of minorities entering Starrett City low enough to avoid setting off a wave of "white flight." Although the "white flight" phenomenon may be a factor "take[n] into account in the integration equation," *Parent Ass'n of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 720 (2d Cir.1979), it cannot serve to justify attempts to maintain integration at Starrett City through inflexible racial quotas that are neither temporary in nature nor used to remedy past racial discrimination or imbalance within the complex.

Appellants' reliance on *Otero* is misplaced. In *Otero* the New York City Housing Authority ("NYCHA") relocated over 1800 families in the Lower East Side of Manhattan to make way for the construction of new apartment buildings. 484 F.2d at 1125. Pursuant to its regulations, NYCHA offered the former site occupants first priority of returning to any housing built within the urban renewal area. *Id.* at 1125–26. However, because the response by the largely minority former site residents seeking to return was nearly seven times greater than expected, NYCHA declined to follow its regulation in order to avoid creating a "pocket ghetto" that would "tip" an integrated community towards a predominantly minority community. *Id.* at 1124, 1126. It instead rented up half of these apartments to non-former site occupants, 88% of whom were white. *Id.* at 1128.

In a suit brought by former site occupants who were denied the promised priority, the district court held as a matter of

law that "affirmative action to achieve racially balanced communities was not permitted where it would result in depriving minority groups" of public housing, and thus granted summary judgment in favor of plaintiffs. *Id.* at 1130. This court reversed the grant of summary judgment, stating that public housing authorities had a federal constitutional and statutory duty "to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos," but we recognized that "the effect in some instances might be to prevent some members of a racial minority from residing in publicly assisted housing in a particular location." *Id.* at 1133–34.

*Otero* does not, however, control in this case. The challenge in *Otero* did not involve procedures for the long-term maintenance of specified levels of integration, but rather, the rental of 171 of 360 new apartments to non-former site occupants, predominantly white, although former site residents, largely minority, sought those apartments and were entitled to priority under NYCHA's own regulation. The *Otero* court did not delineate the statutory or constitutional limits on permissible means of integration, but held only that NYCHA's rent-up practice could not be declared invalid as a matter of law under those limits. In fact, the court in *Otero* observed that the use of race-conscious tenanting practices might allow landlords "to engage in social engineering, subject only to general undefined control through judicial supervision" and could "constitute a form of unlawful racial discrimination." *Id.* at 1136.

It is particularly important to note that the NYCHA action challenged in *Otero* only applied to a single event—the initial rent up of the new complexes—and determined tenancy in the first instance alone. NYCHA sought only to prevent the immediate creation of a "pocket ghetto" in the Lower East Side, which had experienced a steady loss of white population, that would tip the precarious racial balance there, resulting in increased white flight and inevitable "non-white ghettoization of the community." *Id.* at 1124. Further, the suspension of NYCHA's regulation did not

operate as a strict racial quota, because the former site residents entitled to a rental priority were approximately 40% white, *id.* at 1128. As a one-time measure in response to the special circumstances of the Lower East Side in the early 1970's, the action challenged in *Otero* had an impact on non-whites as a group far less burdensome or discriminatory than Starrett City's continuing practices.

## CONCLUSION

We do not intend to imply that race is always an inappropriate consideration under Title VIII in efforts to promote integrated housing. We hold only that Title VIII does not allow appellants to use rigid racial quotas of indefinite duration to maintain a fixed level of integration at Starrett City by restricting minority access to scarce and desirable rental accommodations otherwise available to them. We therefore affirm the judgment of the district court.

JON O. NEWMAN, Circuit Judge, dissenting:

Congress enacted the Fair Housing Act to prohibit racial segregation in housing. Starrett City is one of the most successful examples in the nation of racial integration in housing. I respectfully dissent because I do not believe that Congress intended the Fair Housing Act to prohibit the maintenance of racial integration in private housing.

### I.

Starrett City is a privately owned apartment complex in Brooklyn. It consists of 46 high-rise buildings containing 5,881 rental units. Nearly 17,000 people live there. From its inception Starrett City has been planned and operated to achieve and maintain racial integration.

The complex was originally to have been built as a cooperatively owned housing development by the sponsor of Co–Op City in the Bronx. When financing was not obtained, the project was taken over by the current owner, whose business was rental

housing. Because New York City had given the previous developer substantial tax abatements, the City's approval was necessary if Starrett City was to have the benefit of these tax abatements. The prospect of a large, low-income rental housing complex generated considerable political opposition within the City from those who feared that the project would attract only minority tenants. The new owner and the New York State Division of Housing and Community Renewal (DHCR) gave assurances that affirmative steps would be taken to maintain Starrett City as an integrated community. On these assurances, the New York City Board of Estimate approved the construction of Starrett City as a rental development.

At that time, DHCR policy called for an integration goal of 70% majority and 30% minority tenants in state-sponsored projects. The defendants adopted this goal for Starrett City. Since the size of tenants' families varied, the target percentages reflected the anticipated racial distribution of rental units, rather than of persons living in the complex. To reach its target of racial balance, Starrett City explicitly declined to rent on a first-come, first-served basis. Instead, reacting to the fact that Blacks and other minorities applied for apartments at Starrett City in far greater numbers than Whites, the management imposed ceilings on the number of apartments of various sizes that would be rented to Blacks and other minorities. As the number of tenants of each minority reached the ceiling for a particular size of apartment, subsequent applicants from that minority were placed on a waiting list until sufficient vacancies occurred to permit a rental to a member of that minority without exceeding the established ceiling.

As experience with this rental policy developed, Starrett City decided that it would permit the percentage of apartments rented to minorities to move above 30% and to reach approximately 35%. The components of this aggregate figure are 21% Black, 8%

Hispanic, 4.5% Oriental, and 2% other or mixed. These figures have been fairly constant since 1976. During that period the minority percentage of the Starrett City *population* has been approximately 45%. In 1984, Starrett City agreed, as part of a settlement of a lawsuit brought by a class of Black applicants, to raise the minority rental unit percentage to 38% over five years.

The consequence of Starrett's policy of maintaining racial balance has been that Black applicants constitute a disproportionately larger share of the waiting list for apartments than do Whites, and remain on the list for considerably longer periods of time than do Whites. As of November 1985, Blacks made up approximately 54% of the waiting list while Whites filled approximately 22% of the places on the list. For a two-bedroom apartment, the average waiting time on the list for qualified applicants was twenty months for Blacks and two months for Whites; for a one-bedroom apartment, the comparable figures were eleven months and four months.[1]

The development of Starrett City as an apartment complex committed to a deliberate policy of maintained racial integration has at all times occurred with the knowledge, encouragement, and financial support of the agency of the United States directly concerned with housing, the Department of Housing and Urban Development (HUD). Under a contract between HUD and Starrett City, the federal government pays all but one percent of the debt service of the mortgage loan extended to Starrett City by the New York State Housing Finance Agency (HFA). By March 1986 HUD had paid HFA more than $211 million on Starrett City's behalf. In exchange for this interest subsidy, Starrett City agreed to limit the rent for eligible tenants to a monthly figure specified by HUD or to a stated percentage of the tenant's monthly income (initially 25%, now 30%), whichever is greater. In addition, HUD has provided

---

1. Occasionally, the burden of Starrett City's rental policy falls on Whites. The complex designates certain buildings for senior citizens and, during periods when White seniors have applied for these units in greater numbers than Black seniors, White seniors have waited for apartments longer than Black seniors.

rental subsidies for tenants with low incomes. Since 1981 these rental subsidies have been nearly $22 million a year.

Despite its close cooperation in the development of Starrett City as an integrated housing complex, the United States now sues Starrett City to force it to abandon the rental policies that have enabled it to maintain racial integration. The bringing of the suit raises a substantial question as to the Government's commitment to integrated housing. The timing of the suit puts that commitment further in doubt. In 1979 a class of Black applicants for housing at Starrett City brought suit to challenge on federal statutory and constitutional grounds the same tenant selection policies at issue in this case. *Arthur v. Starrett City Associates,* 79 Civ. 3096 (ERN) (E.D.N.Y.1979). With the federal government observing from the sidelines, the parties to the *Arthur* litigation engaged in protracted settlement negotiations. More than four years later, a mutually advantageous settlement was reached. Starrett City was permitted to continue its policy of maintaining integration through its tenant selection policies. In return, Starrett City agreed to increase by three percent over five years the proportion of rental units occupied by minority tenants. At the same time, DHCR, the state housing agency, which was also a defendant in the *Arthur* litigation, agreed to take affirmative steps to promote housing opportunities for minorities in DHCR-supervised housing projects in New York City. Specifically, the State agency agreed to give a priority in other projects to minority applicants on the Starrett City waiting list. No member of the class of minority applicants for housing at Starrett City objected to the settlement. Thus, the needs of the minority class for whose benefit the suit had been brought were met to their satisfaction by providing for more rental opportunities both at Starrett City and elsewhere. Just one month after that settlement was reached, the United States filed this suit, ostensibly concerned with vindication of the rights of the same minority applicants for housing who had just settled their dispute on favorable terms.

## II.

The only issue in this case is whether Starrett City's rental policies violate Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 (1982 & Supp. III 1985), generally known as the "Fair Housing Act." The United States has explicitly declined to assert any claim of a constitutional violation. *See* Brief for Appellee at 27 n. 9.

The defendants do not dispute that their rental policies fall within the literal language of Title VIII's prohibition on discriminatory housing practices.[2] *See* 42 U.S.C. § 3604. Instead they contend that they are state actors for purposes of the Fourteenth Amendment, that their policies are to be tested under both the Fourteenth Amendment and the Fair Housing Act by the strict scrutiny standard of *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), and that they meet this test because their race-conscious policies further the compelling state interest of promoting integrated housing and are narrowly tailored to achieve that interest. At a minimum, they contend, they are entitled to a trial on the merits to prove their claim.

In my view, the defendants are entitled to prevail simply on the statutory issue to which the Government has limited its lawsuit. Though the terms of the statute literally encompass the defendants' actions, the statute was never intended to apply to such actions. This statute was intended to bar perpetuation of segregation. To apply it to bar maintenance of integration is precisely contrary to the congressional policy "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

We have been wisely cautioned by Learned Hand that "[t]here is no surer way

---

**2.** Though no applicants have been barred from housing because of their race, it is admitted that minority applicants, because of their race, remain on the Starrett City waiting list longer than White applicants.

to misread a document than to read it literally." *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (concurring opinion), *aff'd sub nom. Gemsco, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). That aphorism is not always true with respect to statutes, whose text is always the starting point for analysis and sometimes the ending point. But literalism is not always the appropriate approach even with statutes, as the Supreme Court long ago recognized: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intent of its makers." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

Title VIII b.,rs discriminatory housing practices in order to end segregated housing. Starrett City is not promoting segregated housing. On the contrary, it is maintaining integrated housing. It is surely not within the spirit of the Fair Housing Act to enlist the Act to bar integrated housing. Nor is there any indication that application of the statute toward such a perverse end was within the intent of those who enacted the statute. It is true that there are some statements in the legislative history that broadly condemn discrimination for "any" reason. Senator Mondale, the principal sponsor of Title VIII, said that "we do not see any good reason or justification, in the first place, for permitting discrimination in the sale or rental of housing." 114 Cong. Rec. 5642 (1968). But his context, like that in which the entire debate occurred,[3] concerned maintenance of segregation, not integration. His point was that there was no reason for discriminating against a Black who wished to live in a previously all-White housing project. He explicitly decried the prospect that "we are going to live separately in white ghettos and Negro ghettos." *Id.* at 2276. The purpose of Title VIII, he said, was to replace the ghettos "by truly integrated and balanced living patterns." *Id.* at 3422. As he pointed out, "[O]ne of the biggest problems we face is

the lack of experience in actually living next to Negroes." *Id.* at 2275. Starrett City is committed to the proposition that Blacks and Whites shall live next to each other. A law enacted to enhance the opportunity for people of all races to live next to each other should not be interpreted to prevent a landlord from maintaining one of the most successful integrated housing projects in America.

None of the legislators who enacted Title VIII ever expressed a view on whether they wished to prevent the maintenance of racially balanced housing. Most of those who passed this statute in 1968 probably could not even contemplate a private real estate owner who would deliberately set out to achieve a racially balanced tenant population. Had they thought of such an eventuality, there is not the slightest reason to believe that they would have raised their legislative hands against it.

This Circuit has previously ruled that Title VIII does not apply literally to prohibit racially based rental policies adopted to promote integration. *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir.1973). In that case a public housing authority had committed itself by regulation to give first priority for rental housing to applicants who had been displaced by construction of the project. The housing authority then disregarded its own regulation, based on its apprehension that giving first priority to the class of those displaced from the site, most of whom were non-White, would cause the project to pass the so-called "tipping point" and become predominantly non-White. The first question in *Otero* was whether the authority's deliberate decision not to honor its priority policy because the benefitted class was predominantly non-White violated Title VIII. The Court held that the Act was not violated simply because a race-conscious decision had been made in connection with rental policy:

Congress' desire in providing fair housing throughout the United States was to

stem the spread of urban ghettos and to promote open, integrated housing, even though the effect · in some instances might be to prevent some members of a racial minority from residing in publicly assisted housing in a particular location. *Id.* at 1134.

Once the Court decided that a race-conscious rental policy did not necessarily violate the Act, it then faced the difficult issue in the case—whether the Act imposed an affirmative duty to promote integration of sufficient force to permit the authority to violate its own regulation. On that issue, the Court also ruled in favor of the authority, remanding for a trial at which the defendant could establish that its apprehension concerning a "tipping point" was well founded and that abandonment of its priority policy was necessary to promote integration.

Our case is much easier than *Otero.* Starrett City is not seeking to be released from a commitment it has previously made to any of the applicants for housing. To prevail it need not find in Title VIII some affirmative obligation compelling it to promote integration. It has freely chosen to promote integration and is entitled to prevail unless something in Title VIII forbids its voluntary policy. If anything in Title VIII prohibited race-conscious rental policies adopted to promote integration, *Otero* would have been summarily decided against the defendant.

Acknowledging the significance of the ruling in *Otero,* the Court distinguishes it essentially on the ground that *Otero* involved a policy of limited duration, applicable only to the period in which those dis-placed from the site were applying for housing in the new project, whereas Starrett City seeks to pursue a long-term policy of maintaining integration. I see nothing in the text or legislative history of Title VIII that supports such a distinction. If, as the Court holds, Title VIII bars Starrett City's race-conscious rental policy, even though adopted to promote and maintain integration, then it would bar such policies whether adopted on a short-term or a long-term basis. Since the Act makes no distinction among the durations of rental policies alleged to violate its terms, *Otero's* upholding of a race-conscious rental policy adopted to promote integration cannot be ignored simply because the policy was of limited duration.[4]

But even if Title VIII can somehow be construed to make the lawfulness of a race-conscious rental policy that promotes integration turn on the duration of the policy, Starrett City is entitled to a trial so that it can prove its contention that its policy is still needed to maintain integration. In the District Court the Government, though seeking summary judgment, contested Starrett City's factual contention that a race-conscious rental policy was currently needed to prevent the complex from passing the "tipping point" and becoming segregated. The Government relied on a brief affidavit of a HUD employee, who made primarily the unremarkable observation that it is difficult to predict with any certainty the precise "tipping point" in a particular neighborhood. In opposing summary judgment, Starrett City presented detailed affidavits providing abundant evidence to show that abandonment of its

---

**4.** The Court, drawing a parallel between Title VIII and Title VII, which bars discrimination in employment, 42 U.S.C. § 2000e (1982), supports its view of Title VIII with Supreme Court decisions approving only limited use of race-conscious remedies under statutory and constitutional standards in the *employment* context. Though Titles VIII and VII share a common objective of combatting discrimination, their differing contexts preclude the assumption that the law of affirmative action developed for employment is readily applicable to housing. The Title VII cases have not been concerned with a "tipping point" beyond which a work force might become segregated. Yet that is a demon-strated fact of life in the context of housing. *Cf. Parent Ass'n of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 718–20 (2d Cir.1979) (recognizing validity of a "tipping point" concern in the public school context in the course of framing a remedial desegregation decree). The statutory issue arising under Title VIII should be decided on the basis of what practices Congress was proscribing when it enacted this provision. Whether the constitutional standards for affirmative action differ between the employment and housing contexts need not be considered since the Government has explicitly declined in this litigation to advance any claim of unconstitutional action.

rental policies would cause the complex to pass the "tipping point" and soon become a segregated development. This evidence was solidly based on relevant experience. Several housing developments near Starrett City, operating without a policy of integration maintenance, have become racially segregated, including one across the street from Starrett City.

*Otero* established for this Circuit that a race-conscious rental policy adopted to promote integration does not violate Title VIII and that a defendant must be afforded an opportunity to demonstrate at a trial that its rental policy is needed to prevent a housing complex from becoming segregated. Starrett City's affidavit evidence may well be sufficient to entitle it to summary judgment on this issue of continued need for a race-conscious rental policy to maintain integration. At a minimum it is entitled to a trial to present its evidence to a trier of fact.[5]

Whether integration of private housing complexes should be maintained through the use of race-conscious rental policies that deny minorities an equal opportunity to rent is a highly controversial issue of social policy. There is a substantial argument against imposing any artificial burdens on minorities in their quest for housing. On the other hand, there is a substantial argument against forcing an integrated housing complex to become segregated, even if current conditions make integration feasible only by means of imposing some extra delay on minority applicants for housing. Officials of the Department of Justice are entitled to urge the former policy. Respected civil rights advocates like the noted psychologist, Dr. Kenneth Clark, are entitled to urge the latter policy, as he has done in an affidavit filed in this suit. That policy choice should be left to the individual decisions of private property owners unless and until Congress or the New York legislature decides for the Nation or for New

York that it prefers to outlaw maintenance of integration. I do not believe Congress made that decision in 1968, and it is a substantial question whether it would make such a decision today. Until Congress acts, we should not lend our authority to the result this lawsuit will surely bring about. In the words of Dr. Clark:

> [I]t would be a tragedy of the highest magnitude if this litigation were to lead to the destruction of one of the model integrated communities in the United States.

Because the Fair Housing Act does not require this tragedy to occur, I respectfully dissent.

---

**5.** The Court faults Starrett City for not adequately explaining the basis for its estimate of the time during which its rental policies would have to be retained in the future in order to avoid segregation. If such an explanation is needed, the Court should remand for a trial so that

witnesses can be called to provide it. In any event, the issue is whether Title VIII prohibits what Starrett City is doing today, not whether Starrett City has made an incorrect estimate of what it will have to do sometime in the future to maintain integration.