Pauline **DAVIS**, Cynthia Williams, Cornelia Simmons, and Kim Rivera, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

THE NEW YORK CITY HOUSING AUTHORITY, Defendant.

United States of America, Plaintiff,

v.

The New York City Housing Authority, Defendant.

Nos. 90 CIV. 628(RWS), 92 CIV. 4873(RWS).

United States District Court, S.D. New York.

June 20, 2000.

The Legal Aid Society Civil Division, New York City (Scott A. Rosenberg, Director of Litigation, Helaine Barnett, Attorney–in–Charge, Of Counsel), for Plaintiff Class in Davis.

The New York City Housing Authority, New York City (Jeffrey Schanback, General Counsel, Henry Schoenfeld, Nancy M. Harnett, Stephen W. Goodman, of Counsel), for Defendant.

*OPINION*

SWEET, District Judge.

This action has been remanded to this Court for supplementation of the record, *see Davis v. New York City Hous. Auth.,* No. 99–6238, 2000 WL 232191 (2d Cir. Feb.23, 2000) (summary order), following the appeal of defendant The New York City Housing Authority ("NYCHA") from this Court's grant of a permanent injunction to plaintiffs Pauline Davis et al. (the "Davis Plaintiffs") enjoining NYCHA from implementing the Working Family Preference ("WFP") at NYCHA housing projects with a disproportionately high rate of white occupancy (the "Disproportionate

Projects"), *see Davis v. New York City Hous. Auth.*, 60 F.Supp.2d 220 (S.D.N.Y. 1999). The Court of Appeals has directed further factual development as to three questions: (1) how actual move-out rates in 1998 under the WFP affect the analyses of the expert witnesses; (2) a comparison of how many months it is expected to take to achieve a white occupancy rate below 30% at each of the Disproportionate Projects under the original Tenant Selection and Assignment Plan ("TSAP") versus under the TSAP as modified by the WFP; and (3) whether the tables presented in this Court's prior opinion of August 11, 1999, *see Davis v. New York City Hous. Auth.*, 60 F.Supp.2d 220 (S.D.N.Y.1999), should be revised to reflect a projected white admissions rate below 9.9%.

The background and prior proceedings in this action have been set forth in previous opinions and will not be recounted here. *See Davis v. New York City Hous. Auth.*, 1992 WL 420923 (S.D.N.Y. Dec.31, 1992) (*Davis I*); *Davis v. New York City Hous. Auth.*, 1997 WL 407250 (S.D.N.Y. July 18, 1997) (*Davis II*); *Davis v. New York City Hous. Auth.*, 1997 WL 711360 (S.D.N.Y. Nov.13, 1997) (*Davis III*); *Davis v. New York City Hous. Auth.*, 166 F.3d 432 (2d Cir.1999) (*Davis IV*); *Davis v. New York City Hous. Auth.*, 60 F.Supp.2d 220 (S.D.N.Y.1999) (*Davis V*); *Davis v. New York City Hous. Auth.*, No. 99–6238, 2000 WL 232191 (2d Cir. Feb.23, 2000) (summary order) (*Davis VI*). Following remand, briefs and affidavits were submitted addressing the questions raised

by the Court of Appeals. Oral argument was heard on May 3, 2000.

## I. *Actual 1998 Move-out Rates and Their Effect on the Experts' Conclusions*

The first question raised by the Court of Appeals was "whether and to what extent actual move-outs correspond with projected move-outs and whether and to what extent the actual numbers influence the experts' conclusions." *Davis VI*, 2000 WL 232191, at 2.

Plaintiffs' expert, Dr. Leonard A. Cupingood ("Dr.Cupingood") has set forth the relevant data in Table 1 of his April 13, 2000 Affidavit. NYCHA's expert, Dr. David W. Peterson ("Dr.Peterson") has set forth comparable data in Tables 2a and 2b of his Seventh Affidavit. The 1998 numbers differ slightly between the two sets of data because Dr. Peterson used a methodology to adjust NYCHA's internally inconsistent data, while Dr. Cupingood used the NYCHA data without making the adjustment. (*See* Peterson Eighth Aff. ¶ 10 n.3; Cupingood April 28, 2000 Aff. ¶ 19 n.1.) It is not clear whether the adjusted or the non-adjusted data is better for the comparison made here. (*See* Cupingood April 28, 2000 Aff. ¶ 19 n.1.) In any event, as explained below, the experts agree that use of the actual 1998 data does not necessarily increase accuracy nor does it influence their conclusions; thus, differences between the two sets of data are immaterial. For convenience, both Dr. Cupingood's and Dr. Peterson's data are reproduced below in Table 1.

Table 1

| Project * | Overall Rate (%)** | | White Rate (%) | | | Non–White Rate (%) | | |
|---|---|---|---|---|---|---|---|---|
| | 1991–94 | 1998 | 1991–94 | 1998 (Cup.) | 1998 (Pet.) | 1991–94 | 1998 (Cup.) | 1998 (Pet.) |
| Bay View | 6.5 | 4.9 | 9.1 | 7.5 | 7.7 | 2.9 | 3.4 | 4.5 |
| Berry | 6.5 | 10.0 | 7.4 | 10.1 | 9.4 | 3.5 | 9.8 | 13.7 |
| Cassidy–Lafayette | 10.3 | 12.9 | 12.9 | 13.5 | 14.0 | 4.5 | 12.4 | 14.7 |
| Forest Hills | 4.5 | 2.5 | 5.8 | 3.3 | 7.4 | 2.5 | 1.6 | 0.0 |
| Haber | 8.7 | 8.2 | 10.0 | 6.3 | 7.3 | 7.4 | 10.3 | 12.1 |
| Holmes Towers | 8.3 | 8.1 | 9.7 | 10.1 | 9.5 | 7.1 | 7.2 | 8.6 |
| Independence | 1.6 | 3.7 | 1.7 | 3.0 | 2.5 | 1.6 | 4.9 | 0.8 |
| Isaacs | 6.0 | 6.3 | 8.0 | 8.3 | 6.3 | 3.4 | 5.1 | 6.9 |
| Middletown Plaza | 12.0 | 10.9 | 10.4 | 14.7 | 14.7 | 15.4 | 6.3 | 7.5 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| New Lane | 8.7 | 9.5 | 9.5 | 10.6 | 11.1 | 4.2 | 6.8 | 8.1 |
| Nostrand | 7.1 | 7.0 | 8.2 | 8.7 | 8.9 | 4.6 | 5.7 | 6.8 |
| Pelham Parkway | 6.2 | 6.2 | 8.0 | 6.6 | 6.2 | 3.9 | 5.9 | 8.7 |
| Pomonok | 5.5 | 6.9 | 6.1 | 7.5 | 7.4 | 4.6 | 6.4 | 9.0 |
| Robbins Plaza | 11.4 | 15.3 | 12.7 | 20.5 | 20.5 | 8.5 | 9.0 | 11.9 |
| Sheepshead Bay | 7.5 | 7.4 | 9.5 | 9.4 | 9.1 | 4.8 | 6.2 | 8.1 |
| South Beach | 7.4 | 6.5 | 8.4 | 5.7 | 6.1 | 5.3 | 7.4 | 7.4 |
| Straus | 4.4 | 3.4 | 8.9 | 2.5 | 2.5 | 1.1 | 3.8 | 4.4 |
| Taylor St./Wythe Ave. | 2.2 | 2.7 | 1.5 | 1.1 | 1.1 | 3.1 | 4.7 | 4.7 |
| Todt Hill | 6.0 | 5.8 | 7.6 | 6.6 | 7.1 | 3.3 | 5.0 | 5.8 |
| Williams | 2.0 | 2.2 | 1.5 | 2.0 | 2.3 | 3.1 | 2.4 | 2.4 |
| Overall *** | 6.8 | 7.3 | 8.6 | 8.8 | | 4.4 | 6.5 | |

\* Peterson includes Glenwood, but it is no longer a Disproportionate Project, so it is omitted here.
\* \* Peterson does not include statistics on the overall rate.
\* \* \* Weighed by the Number of Move–Outs; Peterson does not calculate this figure.

Dr. Cupingood has concluded that using actual 1998 turnover rates, as opposed to historical turnover rates from the period 1991 to 1994, "does not necessarily lead to more accurate projections of future occupancy levels because the 1998 rates reflect a single year, rather than a four-year period." (Cupingood April 13, 2000 Aff. ¶ 3(a).) Turnover rates for a single year "can be expected to have a higher variation than during a four-year period." (*Id.* ¶ 4.) Dr. Peterson has concluded that use of 1998 turnover rates "is generally typical of the values that occurred in 1991–94," and therefore "the effect of knowing the actual turnover rates for 1998 is not so much to change the projections into the future as it is to emphasize the fact that they are uncertain." (Peterson Seventh Aff. ¶ 12.) Dr. Peterson, nevertheless, agrees with Dr. Cupingood that use of the actual 1998 numbers does not necessarily increase the accuracy of the projections. (Peterson Eighth Aff. ¶ 9.)

Use of the actual 1998 numbers did not influence the experts' conclusions.[1]

## II. Expected Delay in Reaching 30% White Occupancy Rate Under TSAP Versus WFP

The second question raised by the Court of Appeals was "(a) under the original Tenant Selection and Assignment Plan ("TSAP"), how many months [is it] expected to take to achieve a white occupancy rate below 30% at [each of the Disproportionate Projects]; and (b) under the modified TSAP incorporating the WFP, how many months [is it] expected to take to achieve a white occupancy rate below 30% at [each of the Disproportionate Projects?]" *Davis VI*, at 2.

The Court of Appeals did not specify whether it wished this question to be answered using projections from the 1998 move-out rates or from the 1991–94 rates. As set forth above, because the experts agree that the 1991–94 rates are as acceptable as the 1998 rates, the data set forth here is based on projections from the 1991–94 rates. Data using the 1998 rates has also been calculated and is contained in the affidavits of Dr. Cupingood and Dr. Peterson. In addition, for the reasons set forth below in Section III of this opinion, the calculations of delay assume a 9.9%

1. Dr. Cupingood did, however, note that use of actual 1998 rates "causes an *increase* in the expected segregative impact of the WFP." (Cupingood April 13, 2000 Aff. ¶ 3(a).) Dr. Cupingood estimates that, using the 1998 data, a white admissions rate of 9.9%, and separate turnover rates by race would result in 497 more white families at the 20 Disproportionate Projects after five years, as compared with 422 using the 1991–1994 rates. (*See id.* ¶ 7.) After ten years, the 1998 data would result in 816 more white families as opposed to 696 using the 1991–1994 rates. (*See id.* ¶ 10.)

Dr. Peterson, by contrast, concludes that use of the 1998 turnover rates would cause an increase in the time required to reach 30% white occupancy under the WFP for certain of the Disproportionate Projects, and a decrease in the time for certain other Disproportionate Projects. (*See* Peterson Eighth Aff. ¶ 13.)

white admissions rate. Finally, it is appropriate to utilize statistics based on turnover by race, as opposed to overall turnover.

Dr. Cupingood has set forth the relevant data in Table 6A of his April 13, 2000 Affidavit. For convenience, the portion relevant to the question raised by the Court of Appeals is reproduced below as Table 2. Dr. Peterson's calculations are rejected because they were done assuming a 6.28% white admissions rate without the WFP and an 8.28% rate with the WFP. (*See* Peterson Seventh Aff. ¶ 19.) The calculations previously adopted by this Court in *Davis V* were made assuming a 4.2% white admissions rate without the WFP, *see Davis V*, 60 F.Supp.2d at 238 n. 16, and the Court of Appeals did not remand for the purpose of reconsidering that rate.

Table 2

| Project | Months to Reach 30% Without WFP | Months to Reach 30% With WFP |
|---|---|---|
| Bay View | 17 | 21 |
| Berry | 195 | Will Never Reach 30% |
| Cassidy–Lafayette | 195 | Will Never Reach 30% |
| Forest Hills | 149 | 246 |
| Haber | 146 | Will Never Reach 30% |
| Holmes Towers | Already Below 30% * | Already Below 30% * |
| Independence | 620 | 899 |
| Isaacs | 18 | 29 |
| Middletown Plaza | Will Never Reach 30% | Will Never Reach 30% |
| New Lane | Will Never Reach 30% | Will Never Reach 30% |
| Nostrand | 57 | 85 |
| Pelham Parkway | 6 | 8 |
| Pomonok | 84 | 171 |
| Robbins Plaza | 355 | Will Never Reach 30% |
| Sheepshead Bay | 23 | 35 |
| South Beach | 163 | Will Never Reach 30% |
| Straus | Already Below 30% * | Already Below 30% * |
| Taylor St./ Wythe Ave. | 649 | 1323 |
| Todt Hill | 103 | 198 |
| Williams | 707 | 1066 |

After Davis Move–Ins.

### III. *The Tables in Davis v. Will Not Be Revised*

The third request of the Court of Appeals was that this Court "consider wheth-

er the tables presented in its opinion that relied on the 9.9% admissions rate should be revised in light of Dr. Cupingood's July 27, 1999 affidavit." *Davis VI*, at 3.

The 9.9% projected white admission rate under the WFP was arrived at by Dr. Cupingood using a computer simulation and 1995 data, before the WFP went into effect. Using actual data from 1998, adjusted for the "pipeline effect" and other factors, Dr. Peterson concluded that the actual white admission rate would be 6.88%. (Peterson Seventh Aff. ¶ 5.) Dr. Cupingood disputed this figure, asserting that the proper rate would be 8.53%. (Cupingood July 27, 1999 Aff. ¶ 10.) Dr. Cupingood acknowledges that the calculation of the 8.53% rate was based on a copying error and that the correct rate using that methodology should have been 8.28%. (Cupingood April 13, 2000 Aff. ¶ 25.)

Dr. Cupingood does not believe, however, that his calculations should be adjusted for an 8.28%, rather than 9.9%, rate, as the existence of this Court's injunction at the Disproportionate Projects could have led to white "turndowns," i.e., certain white families may have declined offers to live in public housing unless they could live in a predominantly white project. (Cupingood April 13, 2000 Aff. ¶ 26.) To buttress this proposition the Davis Plaintiffs cite to John Yinger, *Closed Doors, Opportunities Lost: The Continuing Costs of Housing Discrimination* 13–14 (1995) (noting that many white families prefer neighbors who are also white), and to various cases, *see United States v. Starrett City Assocs.*, 840 F.2d 1096, 1099 (2d Cir.1988); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 110, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Barrick Realty, Inc. v. City of Gary*, 354 F.Supp. 126, 135 (N.D.Ind.1973), *aff'd* 491 F.2d 161 (7th Cir.1974). NYCHA, though it disputes the admissibility of the Yinger cite as evidence, is unable to contravene the unfortunate fact of the underlying proposition.

Dr. Cupingood also asserts that Dr. Peterson invalidly compared data between 1997 and 1998, because the applicant pools differ each year. (Cupingood April 28, 2000 Aff. ¶ 2(c).)

Dr. Peterson responds that Dr. Cupingood has provided no evidence to support the assertion that the WFP would artificially lower the system-wide intake rate for white families below 9.9%. (*See* Peterson Eighth Aff. ¶ 4.) Moreover, Dr. Peterson contends that Dr. Cupingood's calculation method already accounts for the possibility of such an artificial depression, because Dr. Cupingood assumed that the percentages of white and non-white families placed in one of the Disproportionate Projects in the years 1991–94 would be the same as the percentages of white and non-white qualified families which in the future would desire to be placed in a Disproportionate Project, regardless of the policy under which they would qualify. (*See id.* ¶ 5.)

Dr. Cupingood's reasoning is more persuasive. Combination of the 1997 and 1998 data, which is drawn from two separate applicant pools, introduces new uncertainties into the calculations. Also, it is not clear from Dr. Peterson's affidavit whether Dr. Cupingood's methodology did in fact already account for the possibility of artificial depression due to the WFP. Dr. Cupingood's computer simulation using the 1995 data remains the best means of estimating the expected white admissions rate under the WFP, and consequently the 9.9% rate used in the previous findings of fact will not be revised.

However, regardless of the conclusions reached in the preceding paragraph, Dr. Cupingood, in his April 13, 2000 Affidavit, has already calculated the effect of relying upon a 8.28% rate revision. (*See* Cupingood April 13, 2000 Aff., Tables 8A–13B.) As the calculations set forth in Tables 8A–13B of that affidavit demonstrate, utilization of an 8.28% rate does not significantly decrease the WFP's effect of delaying the desegregation of the Disproportionate Pro-

jects. Thus, adoption of the 8.28% rate, and revision of the calculations, would not change this Court's prior conclusion that implementation of the WFP at the Disproportionate Projects would result in a significant perpetuation of discrimination.

It is so ordered.