724 F.Supp. 148 (1989)
Ruth BRONSON and Lisa Carter on behalf of themselves and all other persons who are similarly situated, Plaintiffs,
v.
CRESTWOOD LAKE SECTION 1 HOLDING CORPORATION, Jonathan Woodner Company, Ian Woodner, and Michael D. Aiello, Defendants.
No. 89 Civ. 5386 (MJL).
United States District Court, S.D. New York.
October 23, 1989.
*149 Westchester Legal Services by Jerrold M. Levy and John T. Hand, Yonkers, N.Y., Sullivan & Cromwell by John E. Kirklin, David B. Tulchin and William J. Snipes, New York City, for plaintiffs.
Bobrow Greenapple Skolnik & Shakarchy by Lawrence Greenapple, New York City, for defendants.

OPINION AND ORDER[*]
LOWE, District Judge.
Before this Court is plaintiffs' motion for a preliminary injunction. For the reasons stated below, the motion is granted.

BACKGROUND
This proposed class action[1] involves a challenge under Title VIII of the Civil Rights Act of 1968 (also known as the Fair Housing Act) to the rental policies of Crestwood Lake ("Crestwood"), an apartment complex located in the city of Yonkers, New York. Specifically, plaintiffs allege that Crestwood's rental policies  variously consisting of its refusal to consider the applications of any person who receives Section 8 federal housing assistance or whose income is not at least three times the rent of the apartment for which that person is applying  disproportionately and adversely impact upon black and hispanic *150 ("minority") applicants for tenancies in comparison to white applicants. Plaintiffs additionally allege that these policies were intentionally crafted to exclude minorities from apartments at Crestwood.
Plaintiff Ruth Bronson currently resides with her child and grandchild in the Southwest portion of Yonkers, New York. A recipient of public assistance, Bronson also holds a Section 8 housing assistance voucher issued by the Yonkers Housing Authority. Plaintiff Lisa Carter also resides, with her three children, in the Southwest portion of Yonkers. She, too, is a recipient of public assistance and holds a Section 8 housing assistance voucher.[2] In addition to these subsidies, Carter receives $693.00 per month in child support. Both Carter and Bronson are black.
The Southwest section of Yonkers in which plaintiffs currently reside has been the subject of extensive litigation elsewhere in this District. Most notable for its extreme concentration of the city's minority population  80.7% of Yonkers' minorities reside there  it is also the site for virtually all of the city's government subsidized housing projects. Id. at ¶ 59. According to plaintiffs' affidavits, this community is also riddled with drug users and dealers, many of whom actively engage in their trade directly across the street from Carter's apartment complex. Affidavit of Lisa Carter at ¶ 6. Dealers' solicitations are not infrequent; Bronson's twelve year old grandchild is himself regularly recruited, though unsuccessfully, for drug-related tasks. Affidavit of David Bronson at ¶ 5. Not all of the neighborhood's children, many of them truants, have succeeded, as he has, in their resistance to the drug culture. Affidavit of Ruth Bronson at ¶ 5. The Southwest section of Yonkers also abounds with other forms of criminal activity. The apartment building in which the Bronsons live is "not secure, so that strangers often enter the building and roam the halls." Id. at ¶ 4. Fearing a break-in or assault, the Bronson family often sleeps poorly at night. Affidavit of David Bronson at ¶ 5. Carter, too, fears for the safety and welfare of herself, her children and her home. Affidavit of Lisa Carter at ¶ 10.
It is against this backdrop and in the hope of relocating to another area of Yonkers, that plaintiffs Bronson and Carter looked to Crestwood Lake Apartments, a housing development with over one thousand units located on the east side of the city. Crestwood is owned by defendant Crestwood Lake Section 1 Holding Corporation ("Crestwood Corporation").[3]
To that end, Ruth Bronson went to defendants' rental office at Crestwood on June 23, 1989 in search of a two bedroom apartment for herself and her child and grandchild. While there, she spoke with rental agent Margaret Naughton ("Naughton") who informed Bronson that rent for such an apartment is $875 per month. Bronson indicated to Naughton that she could meet this rent entirely through the shelter component of her public assistance grant and her Section 8 housing voucher. Naughton thereupon asserted that Bronson "probably would not pass the credit check because [she did] not have earned income." Bronson's initial contact with Crestwood apparently concluded at this juncture.
Later that day, Bronson related these events to two attorneys employed by Westchester Legal Services, Inc.  John Hand and Jerrold Levy  both of whom accompanied Bronson back to the rental office to question the rental manager about Bronson's application. While there, Levy and Hand spoke with Michael D. Aiello, the Property Manager for defendant Jonathan Woodner Company, who initially stated that Bronson could not pass the credit check because she did not have earned income. When informed by one of the attorneys *151 that such a requirement would constitute unlawful race discrimination because it would have a disparate impact on minority persons, Aiello stated that the management would allow Bronson to apply for a tenancy and that, if Bronson passed the credit check, her name would be placed on a waiting list for an apartment.
Bronson returned to Crestwood on June 26 to fill out an application for a credit check and was told by Naughton that the results would be returned within two days. When ten days had passed, Bronson called Naughton to determine the status of her application and was informed that the credit check had not, in fact, been returned to the office.[4] Naughton went on to inform Bronson that, at any rate, she had just spoken with her manager and was told that Crestwood was "not accepting Section 8." Bronson's application was subsequently rejected. Affidavit of Michael Bello at ¶ 2.
Carter's application process followed a considerably less tortuous course. When she appeared at defendants' rental office on July 18, 1989 to apply for either a two or three bedroom apartment, she was informed by Naughton that the rent for such apartments begin at $850 and $1000 per month, respectively. Like Bronson before her, Carter indicated that she could afford either of these rents through her public assistance grant, Section 8 voucher, and a reasonable portion of her monthly child support payments. Carter thereafter proceeded to fill out an initial application, but was told that a credit check would be executed only after an apartment became available. According to the Complaint, Naughton further questioned Carter about the sources of her income and attempted to discourage her from applying to Crestwood. Since this initial interview, Carter's application has been placed on a waiting list. However, because defendants consider her "ability to pay [to be] in serious doubt," Carter is unlikely to be offered an apartment at Crestwood. Affidavit of Michael Bello at ¶ 2; Affidavit of Anthony Aiello at ¶ 12.
A "settlement" conference between the parties apparently took place on July 24, 1989. It was at this meeting that Charles Macellaro, counsel for Crestwood Lake Corporation,[5] represented to Westchester Legal Services that further attempts to secure plaintiffs' tenancies at Crestwood would generate considerable political controversy and community opposition. Macellaro further stated that attempts should not be made to increase the racial "mix" at Crestwood because it would induce white residents to leave. When asked about Crestwood's policy on accepting Section 8 vouchers, Macellaro disavowed Naughton's earlier representation that Crestwood would not accept the vouchers and, instead, articulated, apparently for the first time, Crestwood's policy of accepting only those applicants who have an annual income at least equal to three times the annual rent (hereinafter "the triple income test"). Affidavit of Jeffrey Lubell at ¶¶ 24-28; Affidavit of Charles Macellaro at ¶ 5.
On August 31, 1989, by Order to Show Cause, plaintiffs moved for an expedited hearing on the instant motion for a preliminary injunction. They sought, in the interim, an order temporarily enjoining defendants from entering into a lease for the occupancy of two currently available two bedroom apartments which, plaintiffs claim, would have been made available to them but for the enforcement of defendants' allegedly discriminatory application policies. That same day, Judge Kimba Wood, in her Part I capacity, granted plaintiffs' application for the temporary restraining order and expedited hearing. It should be noted that during the course of the hearing before Judge Wood, counsel *152 for Crestwood disavowed Naughton's earlier representation that Crestwood did not accept Section 8 applicants. Indeed, he stated on the record that Crestwood currently has eight tenants who receive such subsidies. Transcript of August 31, 1989 at 11.[6]
In their Complaint, plaintiffs allege that defendants' refusal to rent to Section 8 voucher holders or to applicants who do not meet the triple income test (i.e. effectively all Section 8 voucher holders), has a substantially disproportionate and adverse impact upon minority persons and is therefore violative of plaintiffs' rights under the Fair Housing Laws, 42 U.S.C. § 3601 et seq., as well as under state law. Plaintiffs also claim that the aforementioned policies constitute an attempt to restrict the minority composition at Crestwood and, as such, have a racially discriminatory purpose. For the purpose of the instant motion for a preliminary injunction, however, plaintiffs are asserting only their disparate impact claim. See Plaintiffs' Reply Memorandum of Law at 4.
In their original application, plaintiffs sought from this Court a preliminary order:
1) enjoining defendants and their agents from applying to the applications of Bronson and Carter any requirement that a prospective tenant may not use Section 8 housing assistance in payment of rent, must have earned income, must have an income of at least three times the apartment rental, or may not be a minority person; and
2) requiring defendants to place plaintiffs on the apartment waiting list at Crestwood in the positions they would have occupied but for the application of these policies and to process plaintiffs applications and make rental apartments available to them at Crestwood in accordance with normal procedures and without regard to the aforementioned policies.
In their Reply Memorandum of Law, plaintiffs have modified their request for relief in accordance with certain factual assertions which are discussed infra. They are now seeking an order:
1) requiring defendants to evaluate the named plaintiffs' applications without regard to whether they are employed and have earned income, to whether they have income in excess of three times the rent, to the amount of their income either absolutely or compared to that of other applicants, or to whether their tenancies require entry into the standard Section 8 lease;
2) requiring defendants to immediately provide plaintiffs with available apartments of their choice at Crestwood unless defendants can demonstrate that there are other current applicants for those apartments who are more desirable as tenants on the basis of legitimate, objective criteria and without regard to the factors listed above.
Hearings on plaintiffs motion for a preliminary injunction were held before this Court on September 22, 1989 and September 29, 1989 ("H"). Both parties presented an expert witness to discuss the accuracy and relevance of the statistical analysis relied on by plaintiffs. At the close of the September 29 hearing, this Court granted plaintiffs request for a preliminary injunction, ordered that the two apartments subject to the temporary restraining order remain vacant until the issuance of this opinion, and instructed both parties to submit proposals as to what remedy would be most appropriate.
In response, plaintiffs proposed an order that directs Crestwood to immediately offer for occupancy to plaintiffs Bronson and Carter two available apartments. Defendants responded by submitting a proposed order that substantively mirrors the relief requested by plaintiffs in their Reply Memorandum of Law except that defendants include a number of other provisions that they deem necessary to protect their interests pending final disposition of this matter. Defendants seek as part of the order: i) a condition that plaintiffs post a security; ii) a stay of the operation of this injunction *153 pending the conduct of an appeal; and iii) a command that defendants would be free to evict the plaintiffs without any restrictions in the event this order were reversed.

DISCUSSION
In order to succeed on their motion for a preliminary injunction, plaintiffs must establish that they will suffer irreparable harm and either that there is a likelihood of success on the merits of their underlying claim or that there are sufficiently serious questions going to the merits as to make them a fair ground for litigation, with the balance of hardships tipping decidedly in plaintiffs' favor. Johnson v. Kay, 860 F.2d 529, 540 (2d Cir.1988); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979).

Irreparable Harm
Plaintiffs argue that, in the absence of preliminary injunctive relief, they will be irreparably harmed by continued exposure to the high crime rate, active drug trade and unsafe conditions of their present community in the Southwest section of Yonkers. "[T]he longer ... the families remain in their current residences, the more likely they are to fall victim ... to the risk of living in a hostile and alienating environment." Plaintiffs' Memorandum of Law at 18. Second, plaintiffs urge that, since the existing apartment units at Crestwood are likely to be filled during the pendency of this lawsuit, a preliminary injunction is necessary to ensure that a remedy will be available should they ultimately succeed on the merits of their claims.
In opposition to these assertions, defendants argue that nothing precludes plaintiffs from obtaining desirable housing elsewhere in Yonkers pending this Court's final determination. In considering the instant application, however, this Court finds defendants' contention irrelevant, given plaintiffs' plain desire to live at Crestwood and not elsewhere in Yonkers. Moreover, even assuming the availability of other housing units were somehow germane to this action, those apartments now free on the rental market, as plaintiffs represent, are either too expensive or too small for plaintiffs' needs. Plaintiffs' Reply Memorandum of Law at 24. Finally, even if plaintiffs undertake to find housing elsewhere at this juncture, later success on the merits of their claim will necessarily bear with it the social and psychological costs of yet another move. As one court has explained it:
... a person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that housing is found, even in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again.
Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1424 (11th Cir.), cert. den. sub nom. Windrush Partners, Ltd. v. Metro Fair Housing Services, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984). Such concerns are particularly acute where, as here, the victims of the purported discrimination include young children. It is for this reason, among others, that the Court in Gresham concluded that "when housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination." Id. at 1423.

Likelihood of Success on the Merits
One of the principal functions of Title VIII is to promote "open, integrated residential housing patterns." Otero v. New York Housing Authority, 484 F.2d 1122, 1134 (2d Cir.1973). To that end, and pursuant to its powers under the Thirteenth Amendment, Congress has made it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604. "Housing practices unlawful under Title VIII include not only those motivated by a racially discriminatory purpose, but also those that disproportionately affect minorities." United States v. Starrett City Associates, 840 F.2d 1096, 1100 (2d *154 Cir.1988). Under this basis for liability, known as the disparate impact theory, "a prima facie case is established by showing that the challenged practice of the defendant `actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.'" Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 934 (2d Cir.1988) (quoting from United States v. City of Black Jack, 508 F.2d 1179, 1184-85 (8th Cir.1974), cert. denied, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)). Accordingly, plaintiffs under Title VIII need not show that the policies complained of were fashioned with discriminatory intent. This Circuit's rejection of an intent requirement under the Fair Housing Act rests principally upon the long recognized parallel between Title VIII and Title VII jurisprudence and upon the fact that, under the latter statute, discriminatory effect alone is sufficient to establish a violation. See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 429-36, 91 S.Ct. 849, 852-56, 28 L.Ed.2d 158 (1971).[7] Once plaintiffs have succeeded in making a prima facie showing of discriminatory effect, the burden shifts to the defendants to present bona fide and legitimate justifications for their policies.
Using alternative statistical approaches, plaintiffs have demonstrated that the challenged application policies utilized by the defendants do indeed have a substantial disparate impact on minority persons. Under all of these statistical approaches, plaintiffs have used as the general applicant pool all Yonkers renters who, after payment of taxes and rent required for residence at Crestwood, would have income equal to or greater than the New York State-determined standard of need. See Supplemental Affidavit of Jeffrey Lubell at ¶ 2. According to 1980 Census figures, that pool consists of 16,883 households, of which 2,820 (16.70%) are minority households, and of which 14,063 (83.30%) are non-minority households. Id. at ¶ 3. Application of Crestwood's policy of rejecting holders of Section 8 vouchers, alone, would have the effect of disqualifying from tenancies 6.06% of the minority households in the applicant pool, but only 0.25% of non-minority households in the pool. Affidavit of Matthew Goldstein at ¶ 3a. Stated another way, the odds of being excluded from Crestwood on the basis of the Section 8 policy is over 25 times greater for minority persons than for non-minorities. Id. at ¶ 4a. These figures are hardly surprising given the fact that, while only 16.7% of the total applicant pool represents minority households, 82.6% of the Section 8 voucher holders within that pool are minorities.
While the application of Crestwood's triple income test does not result in equally dramatic figures, it too has a substantially disparate impact upon otherwise qualified minority households. Of the roughly 14,063 non-minority households within the applicant pool, 3,945 or 28% qualify for tenancies at Crestwood under the triple income test. By contrast, only 14% of the minority households otherwise capable of affording defendants' apartments qualify under the test. Id. at ¶ 3d. Consequently, non-minorities qualify at a rate of more than twice that for minorities. Using these same statistical figures, an odds analysis demonstrates that the odds of being excluded by the triple income test are 2.5 times greater for minority persons than non-minority persons. Id. at ¶ 4b.
Defendants challenge the methodology offered by plaintiffs on a number of fronts. At hearings held on September 22, 1989 and September 29, 1989, defendants challenged plaintiffs' construction of the general applicant pool from which they gleaned data as well as the applicability of the data thus obtained. Defendants take issue with plaintiffs' use of 1980 census data to determine the discriminatory effect today of *155 Crestwood's application practices. Defendant's primary contention is that by using the 1980 census material plaintiffs are looking at 1980 incomes in determining the group of Yonkers residents who could afford 1989 rents at Crestwood. Defendants' argument fails, however, because plaintiffs look to the 1980 census data only to determine the approximate racial make-up of those Yonkers residents who are renters and who, after payment of taxes and rent required at Crestwood, would have income equal to or greater than the New York State-determined standard of need. As a result, plaintiffs are not comparing 1980 incomes with 1989 rents as defendants allege.[8]
A problem in using the 1980 census data, however, is the fact that a significant racial migration in and out of Yonkers or between income groups since the time of the census would affect the accuracy of the results obtained based on this data. Yet, plaintiffs have established that the 1980 census data is the most recent compilation available. Moreover, plaintiffs have produced specific estimates of the current demographics of Yonkers that satisfactorily confirm the statistical results drawn from the 1980 census data. H. at 61-67. Lastly, by applying their methodology to different pools of Yonkers residents drawn from varying income groups, plaintiffs have demonstrated that the discriminatory impact of Crestwood's practices is so substantial that slight variances in the racial makeup of the actual pool of applicable renters would not alter the statistical conclusions.
Besides challenging the accuracy of plaintiffs chosen methodology, defendants also argue that a wholly different statistical approach should be utilized. Defendants would have this Court concentrate on the actual distribution of minority persons currently residing at Crestwood vis-a-vis the distribution of minority persons in the overall population of Yonkers. Yet, this is precisely the kind of statistical approach the Supreme Court has emphatically rejected under analogous Title VII disparate-impact cases. See Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); Wards Cove Packing Co., Inc. v. Atonio, ___ U.S. ___, 109 S.Ct. 2115, 2123 n. 8, 104 L.Ed.2d 733 (1989). Thus, even if a "bottom-line" racial balance in the actual tenancies at Crestwood exists, as defendants assert they do, plaintiffs would still have a case under Title VIII "if they could prove that some particular [application] practice has a disparate impact on minorities." Id. This Court is satisfied that plaintiffs' statistical formulations meet that prima facie burden. Accordingly, I now turn to the second prong of the disparate-impact analysis.
Under this second prong, the burden is upon the defendant to show that the challenged practices serve legitimate and genuine business goals. In support of its application policies, defendants assert that the Section 8 voucher prohibition and the triple-income requirement are necessary to insure the payment of rent and adequate protection in the case of a default. Specifically, defendants advance the following justifications of their policies: 1) there is no guarantee from any government agency that either Bronson or Carter will set aside the necessary amount of their public assistance grants to meet the balance of their monthly rental payments after the Section 8 assistance is advanced; and 2) the form of lease which the Section 8 Housing Voucher Contract would require Crestwood to enter into contains provisions not within its standard lease and which it finds objectionable. For example, should the tenant vacate the premises during the term of the tenancy, under the standard lease, but not the Section 8 lease, Crestwood would be able to collect the full amount of rent for the remainder of the term. Moreover, under the Crestwood lease, the tenant must waive his right to a trial by jury in any ensuing court proceedings between the parties. *156 This waiver is not included in the Section 8 lease.
In setting forth these justifications, defendants quite correctly argue that nothing under Title VIII forbids a landlord from seeking "assurance that prospective tenants will be able to meet their rental responsibilities." Boyd v. Lefrak Organization, 509 F.2d 1110, 1114 (2d Cir.), reh'g denied, 517 F.2d 918 (2d Cir.), cert. denied, 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975). The application policies at issue in this litigation, defendants urge, are designed to do nothing more than advance this legitimate and genuine business goal of maximizing the probability of collecting rent.
However, under the limited circumstances of the instant motion, these justifications must be rejected as insubstantial. First, other than general conclusory assertions and broad references to an apartment management manual, defendants have not offered any evidence to show that the challenged policies are reasonably necessary to insure payment of rent or that Crestwood has, in past experience, encountered losses or defaults as a result of accepting Section 8 tenants or tenants who fail to meet the triple income test.
Second, defendants have in the past participated in the Section 8 certificate program which is very similar to the Section 8 voucher program that they now allege is so objectionable. Crestwood currently has four tenants receiving Section 8 subsidies, under the certificate program.[9] From a practical perspective, the differences between the Section 8 certificate program and the Section 8 voucher program are minimal.[10] Under both the certificate program and the voucher program, a landlord such as Crestwood would be reimbursed approximately the same amount for rent not paid by a tenant who vacates the apartment prior to expiration of the lease. In the case of a voucher tenant who fails to pay rent, Crestwood would receive the security deposit equal to a full month's rent. 53 Fed. Reg. 34399 (to be codified at 24 C.F.R. § 887.211). Under the certificate program, Crestwood would potentially be able to receive vacancy payment up to 80% of the contract rent for the month during which the tenant vacates, and for one additional month minus whatever amount the landlord collects from the tenant. 24 C.F.R. § 813.102. A limitation, however, is that Crestwood would only receive the vacancy payment if it was unable to fill the vacancy. 24 C.F.R. § 882.105(b)(2). Moreover, the security deposit available would only be the tenant's portion of one month's rent. 24 C.F.R. § 813.102, 882.112(a). Since Crestwood typically carries a substantial waiting list,[11] in the event a certificate tenant vacated an apartment without paying that month's rent, Crestwood most likely would have no difficulty promptly finding a new tenant for the apartment. Crestwood's eligibility for vacancy payments, therefore, would terminate a short time after the certificate tenant vacated the apartment. The full security deposit available to Crestwood under the voucher program could even be greater than the payment available under the certificate program were the vacant apartment filled immediately. Crestwood is thus assured only slightly greater protection under the certificate program than under the voucher program. As a result, defendants' willingness to accept Section 8 certificate subsidies casts doubt on their claim that their refusal to accept Section 8 voucher applicants stems from their reluctance to depart from *157 their standard lease agreement.[12]
Third, even if, as a general matter, defendants' Section 8 or triple-income policies reflect prior experience with defaulting tenants, the rationale underlying those policies has little force in the instant case. As an initial matter, those portions of plaintiffs' monthly rent covered by the Section 8 vouchers will be paid directly to Crestwood by the Yonkers Housing Authority. In order to further reassure defendants that she is not a tenant risk, plaintiff Bronson has also entered into a direct vendor arrangement with the Department of Social Services whereby her entire public assistance grant will be paid directly to Crestwood. Supplemental Affidavit of Ruth Bronson at ¶ 3. The remaining balance of her monthly rent  $88  will be paid out of a bank account into which Bronson has arranged to have her monthly SSI check deposited. She has given the Executive Director of Westchester Residential Opportunities a power of attorney which authorizes him to pay the remaining balance of her rent directly to Crestwood out of that account. Id. at ¶¶ 4-5. Plaintiff Carter has also entered into a similar arrangement with DSS and has further arranged for her mother  who has a gross income of $38,000 a year  to co-sign any lease she may enter into with Crestwood. Supplemental Affidavit of Lisa Carter at ¶¶ 2-3. Both plaintiffs have agreed to make these arrangements a condition of their leases at Crestwood. Given these extensive third party assurances, neither Crestwood's concerns with tenant creditworthiness nor its objections to those aspects of the Section 8 lease which relate to the tenant's eventual default, appear to be legitimate justifications for denying plaintiffs tenancies at Crestwood.
Finally, I note that one factor that may affect my determination here is evidence of discriminatory intent on the part of the defendants. As this Circuit has explained, while "intent is not a requirement of the plaintiff's prima facie case, there can be little doubt that if evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance." Huntington, 844 F.2d at 936. Indicia of such intent include, inter alia, "[t]he specific sequence of events leading up to the challenged decision." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); see also Robinson, 610 F.2d at 1038. Without passing on the merits of plaintiffs' discriminatory intent claim  a claim which for the present purposes of the instant motion, plaintiffs have relinquished  I note that defendant's inconsistent articulation and application of its tenant selection policies cast the sincerity of those policies in a somewhat questionable light. Throughout the course of their application process, for example, plaintiffs were never made aware of Crestwood's triple income test. It was not until well after she had submitted her credit check application, moreover, that Bronson was informed of Crestwood's Section 8 policy. Carter, on the other hand, was never told that such a policy existed. Indeed, defendant's post hoc objections to the Section 8 lease were, themselves, never articulated until after the Temporary Restraining Order hearing, although Crestwood was certainly given an opportunity to present such objections before the Part I judge.[13] Moreover, *158 despite these very objections, it does in fact appear that Crestwood currently rents apartment units to four Section 8 recipients. It is not insignificant that all four of these tenants are white. Perhaps most perplexing of all, is the inconsistent treatment conferred upon the plaintiffs' applications. Both Bronson and Carter occupy identical positions with respect to defendant's Section 8 and triple income policies, yet while Bronson's application has been flatly rejected, Carter remains on the waiting list for tenancy. These inconsistencies only serve to undermine the sincerity with which defendants advance their "business necessity" policies.

Relief
This Court has been presented with an array of options from which to choose the appropriate form of preliminary relief. Plaintiffs in their Reply Memorandum of Law sought an order: 1) requiring defendants to evaluate plaintiffs' applications without regard to whether they have income in excess of three times the rent, to whether their tenancies require entry into the standard Section 8 lease, or to the amount of their income vis-a-vis other applicants; and 2) requiring defendants to provide plaintiffs with available apartments unless defendants demonstrate that there are other current applicants who are more desirable on the basis of bona fide, objective criteria without regard to the above factors. In response to an invitation by this Court, plaintiffs subsequently submitted a new proposed order. This order would require defendants to immediately offer for occupancy to Bronson and Carter the apartments held open pursuant to order of this Court.
The proposed order submitted by defendants upon the Court's request differs somewhat from that of the plaintiffs. The core of defendant's proposed order does resemble the order initially offered by plaintiffs in their reply papers. The order would require Crestwood 1) to evaluate the plaintiffs' applications without regard to those same factors that plaintiffs' proposed order proscribes; and 2) to offer an available apartment to Bronson or Carter unless defendants demonstrate that there are other applicants for such apartments who are more desirable based upon legitimate, objective criteria. Defendant's proposed order also mandates that until Crestwood offers an apartment to both Bronson and Carter and both of them accept, Crestwood must notify counsel for plaintiffs each time it offers an apartment to any other applicant and shall state the reasons such other applicant was deemed more desirable as a tenant. Defendants also include in their proposed order a number of other provisions that they deem necessary such as:
i) a non-exhaustive list of the legitimate, objective criteria upon which they should rely in choosing tenants;[14]
ii) a command that in the event of dismissal of this action or reversal of this order, defendants would be free to evict these plaintiffs (if they have been accepted as tenants), who would *159 not be permitted to assert as a defense the Emergency Tenant Protection Act of 1974, which bars the eviction of persons in occupancy;
iii) a condition that plaintiffs post a security; and
iv) a stay of the operation of this injunction pending the conduct of an appeal.
As an initial matter, this Court must stress that it seeks to avoid creating a situation whereby in every instance that defendants make a tenant selection, this Court would have to review claims challenging the basis of that decision. Moreover, defendants ability throughout the limited course of these proceedings to offer an ever-changing array of justifications for their refusal to accept plaintiffs' applications only further highlights the difficulty this Court foresees were it to grant relief which merely required defendants to give a nondiscriminatory reason for choosing other applicants. These concerns reveal the primary flaws of defendants suggested remedy.
On the other hand, this Court is not unmindful of the unfairness inherent in forcing Crestwood to accept an applicant who though able to afford the rent at Crestwood presents some other genuine risk. Crestwood does have a right to exercise its own judgement in choosing its applicants so long as it relies on legitimate, objective criteria in so doing. This consideration explains why the relief most recently proposed by plaintiffs must be rejected.
These conflicting interests compel this Court to strike a compromise between the two requested orders. The order thus crafted does take into account the fact that plaintiffs have established that they are able to afford the rents of the apartments they are seeking at Crestwood. Moreover, this Court is satisfied that the security requirement of Fed.R.Civ.P. 65(c) should be waived. Plaintiffs have agreed to vacate the apartments should the preliminary injunction be reversed. In such an event, therefore, defendants would be free to evict these plaintiffs if they refused to leave voluntarily, and plaintiffs would be barred from asserting as a defense the Emergency Tenant Protection Act of 1974. This mandate provides adequate protection to defendants' interests and no security need be posted by plaintiffs. If this order is reversed, there is no reason to expect that defendants would suffer any loss of rent. Plaintiffs have set up assurance plans that guarantee payment of their rent if they are accepted as tenants. Moreover, the fact that plaintiffs would provide one month security deposits and that there is a lengthy waiting list for apartments at Crestwood further minimizes the risk that defendants would suffer damages in the event this preliminary injunction were reversed. Since "there has been no proof of likelihood of harm to the party enjoined," this Court dispenses with the security requirement of Fed.R.Civ.P. 65(c).[15]International Controls Corp. v. Vesco, 490 F.2d 1334, 1356 (2d Cir.1974). See also Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir.1961).
This Court orders defendants to do the following:
1) evaluate the named plaintiffs' applications without regard to whether they are employed and have earned income, to whether they have income in excess of three times the rent, to the amount of their income either absolutely or compared to that of other applicants, or to whether their tenancies require entry into the standard Section 8 lease; and
2) immediately offer plaintiffs occupancy in the two apartments held open pursuant to the temporary restraining order and subsequent ruling by this Court or comparable apartments unless defendants can demonstrate legitimate, objective grounds for denying plaintiffs' applications without regard to the factors listed above in paragraph (1) or the relative desirability of other *160 applicants on the waiting list.[16]
Defendants' entry into leases with Bronson and Carter shall be conditioned upon completion of the third party payment and guarantee arrangements described in the supplemental affidavits of Bronson and Carter dated September 13, 1989.
Defendants request that this Court stay the operation of this injunction pending an appeal of this order. The four factors which a court should consider when exercising its discretion on whether to issue a stay are the following:
(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.
Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987).
The preceding discussion has already highlighted why consideration of these four factors compels this Court to deny defendant's request for a stay of this order. Far from showing a likelihood of success on the merits, defendants have offered minimal defense to plaintiffs' claims. Moreover, should Crestwood offer apartments to plaintiffs under the injunction, they will be paid ongoing rent, and plaintiffs agree to leave voluntarily, without the need for eviction proceedings, should the preliminary injunction be vacated. Plaintiffs have also given proof of their compelling need to secure tenancies at Crestwood.
Finally, the public interest is served by the issuance of this injunction. Defendants note that Bronson and Carter are the first Section 8 voucher holders they have received as applicants. A possible explanation for this phenomenon is that potential applicants who receive Section 8 subsidies have been dissuaded from applying at Crestwood due to their constructive knowledge that large apartment complexes in East Yonkers engage in practices such as those employed by Crestwood. As a result, this injunction may serve as notice to those potential applicants that such practices are illegal and should not simply be tolerated. The request for a stay is therefore denied.
It is so ordered.
NOTES
[*] Subsequently, the Second Circuit Court of Appeal stayed the order.
[1] The parties have agreed to defer consideration of plaintiffs' motion for class certification until after disposition of the instant application.
[2] Plaintiffs were issued these vouchers in accordance with a stipulated modification to a consent decree entered in an action entitled United States of America, et. ano. v. City of Yonkers, 80 Civ. 6761 (LBS). Complaint at ¶ 27.
[3] According to the Complaint, defendant Jonathan Woodner Company, the assumed business name of defendant Ian Woodner, is the rental agent for Crestwood Corporation and acts, in a management capacity, for Crestwood Apartments. Complaint at ¶ 18.
[4] It should be noted that, in her affidavit to this Court, Naughton now admits that the credit report had, in fact, been returned to her on the date of this conversation. Affidavit of Margaret Naughton at ¶ 9.
[5] In his affidavit to this Court, Macellaro states that at the beginning of this conference, he announced to all parties present that, because of a conflict of interest, he was not appearing as counsel to Crestwood Corporation, but in his individual capacity. Affidavit of Charles Macellaro at ¶ 4. Plaintiffs deny that he made any such representation. Supplemental Affidavit of Jeffrey Lubell at ¶ 8.
[6] Counsel has since stated that Crestwood actually has four tenants currently receiving Section 8 subsidies, all of whom are white. See September 22, 1989 Hearing on Preliminary Injunction Motion at 10.
[7] Relying on that parallel, plaintiffs argue that because Title VII disparate impact analysis clearly applies to private defendants, Wards Cove Packing Co. v. Atonio, ___ U.S. ___, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), an effect-based analysis is equally applicable to the instant defendants. See Huntington, 844 F.2d at 934 (noting that inapplicability of disparate-impact analysis to private defendants is now "a matter of considerable uncertainty"); see also Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1038 (2d Cir.1979) (noting that "effects test" for private defendant was "proper standard").
[8] Defendants also argue that plaintiffs used outdated figures in determining the amount of income a family today must allot for food. Plaintiffs, however, simply relied upon the same figures used by New York State in determining standards of need. See Supplemental Affidavit of Jeffrey Lubell at ¶ 3.
[9] These tenants were not receiving Section 8 subsidies at the time they applied for apartments. Rather, after they came into occupancy, they applied for Section 8 certificates and were awarded them. Hearing before Judge Kimba Wood at 11. All of these four tenants are white. H. at 10.
[10] At the hearings held on September 22 and 29, the attorneys in the case discussed at great length the differences between the Section 8 certificate program and the Section 8 voucher program. H. at 25-30, 32-44, 153.
[11] In mid-September, there were 172 applicants on Crestwood's waiting list for two bedroom apartments. Defendant's October 16, 1989 letter to this Court.
[12] The record does not indicate whether the lease agreements between Crestwood and its Section 8 certificate tenants contain jury waiver provisions. In any event, the waiver of jury trial in this instance is of minimal importance, because Bronson and Carter have effectively guaranteed their rental payments. Since Bronson and Carter cannot default on these guarantees, there should never be a non-payment proceeding and, therefore, no jury trial. Moreover, should they abandon the apartments, no eviction proceedings will be required and the apartments will promptly be relet.
[13] Counsel for Crestwood argues that these objections were not raised at the initial hearing because Crestwood had neither the time nor the opportunity to review the Section 8 lease prior to plaintiff's TRO application. This assertion strains credulity given the fact that Crestwood was aware of plaintiffs' pending lawsuit as early as July 18, 1989. See Affidavit of Charles Macellaro at ¶ 3. Even assuming that Crestwood did not have an opportunity to ferret out the objectionable provisions of the Section 8 lease prior to the TRO hearing, this account hardly explains why on June 26 representations were made to Bronson that Crestwood would not accept Section 8 applicants.
[14] Defendants include the following factors as those "legitimate, objective" criteria upon which they believe they are to rely in evaluating plaintiffs' applications:

"(a) Rent payment history (includes a demonstrated ability to pay rent on time and comments from present and former landlords);
(b) Credit history;
(c) Housekeeping habits (includes visits to applicants' residences to assess housekeeping and living standards);
(d) History of violence and/or anti-social behavior (with specific emphasis towards rejection of individuals with a history of behavior associated with racial, ethnic or religious intolerance);
(e) History of drug or alcohol abuse;
(f) History of stable family relationships; and
(g) Availability of sufficient funds to cover rents and projected needs."
All of these factors, however, should not be relied on by Crestwood in their evaluation of plaintiffs' applications under this order. Since plaintiffs have sufficiently assured Crestwood of their ability to make the required rental payments, Crestwood need not consider plaintiffs "rent payment history," "credit history," or ability to "cover rents and projected needs." Moreover, contrary to defendants' assertions, an applicant's "history of stable family relationships" is not a factor relevant to that applicant's suitability as a tenant.
[15] Plaintiffs' financial inability to post a bond also militates against requiring security. See Bass v. Richardson, 338 F.Supp. 478, 490 (S.D.N. Y.1971) ("Poor persons are by hypothesis unable to furnish security as contemplated in Rule 65(c)" (citations omitted)).
[16] In other words, defendants are to offer plaintiffs occupancy in these apartments unless defendants can demonstrate, based on legitimate, objective grounds and without reference to any of the above proscribed factors, that these plaintiffs are unfit to be tenants.

Defendants appear to have already determined that there are legitimate, objective grounds upon which to reject plaintiff Carter. See Defendants' October 16, 1989 letter to this Court. Defendants would be well to keep in mind, however, that due to its past ill-treatment of Carter, this order places the burden on Crestwood to determine the accuracy of the adverse information regarding Carter that it claims to have received. This should include providing Carter an opportunity to respond to the allegations, as well as giving fair consideration to such a presentation if made.